IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

PORTLAND MARCHE, LLC, AND
CERES RICHLAND, LLC,

          Plaintiffs,

    v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION,

          Defendant.

Case No. 3:21-cv-00569-IM

OPINION AND ORDER GRANTING
IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

IMMERGUT, District Judge.

This action comes before this Court on Defendant Fannie Mae's ("Defendant") Motion for Summary Judgment. ECF 36. Defendant moves for summary judgment on all of Portland Marche, LLC's and Ceres Richland, LLC's (collectively, "Plaintiffs") claims and on Defendant's third counterclaim. A hearing on the motion was held on September 12, 2022. ECF 57. Since then, the parties have been engaging in mediation, but have apparently not reached a resolution. ECF 58–60.

For the reasons stated on the record and for the following reasons, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiffs' claims that Defendant violated Oregon House Bill 4204 ("H.B. 4204") and committed common law fraud. This Court finds that

Defendant did not violate H.B. 4204 as a matter of law and that Plaintiffs failed to allege cognizable damages related to their claim for fraud. Defendant's Motion is DENIED as to Plaintiffs' claims for declaratory judgment and that Defendant violated the common law duty of good faith and fair dealing. This Court finds that Plaintiffs violated the express terms of the change of use prohibition found in Section 6.02(a)(1) of the Loan Agreement. However, genuine issues of material fact remain as to whether Defendant waived the right to declare Plaintiffs in default and accelerate the loan for Plaintiffs' violation of that provision and whether Plaintiffs' breach of the provision was material. This Court finds that genuine issues of material fact also remain regarding whether Defendant modified the contract through the actions of Defendant's agent and subsequently violated Plaintiffs' reasonable contractual expectations. Therefore, Defendant's Motion is also DENIED as to Defendant's third counterclaim for judicial foreclosure.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court views the evidence in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters*, *Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.*

The non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Further, the party cannot rely on the pleadings to create a "genuine" dispute, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and may not rest on conclusory or speculative evidence but rather must "set forth specific facts in support of [its] . . . theory." *Thornhill Pub. Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979) (citing Fed. R. Civ. P. 56(e)). Although "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks and citation omitted).

## BACKGROUND

On or about April 13, 2017, Plaintiffs entered into a mortgage loan agreement (the "Loan Agreement") for the real and personal property known as 11 Marche Apartments (the "Property") with Walker & Dunlop, LLC ("Walker"), which included a $12,742,000 loan to Plaintiffs. ECF 36 at 3; *see* ECF 21-1, Ex. 1; *see also* ECF 38-5; ECF 44-1, Ex. 1. The Property is a multi-unit residential apartment building located at 1101 SW Market Street in Portland, Oregon. ECF 43 at 3. That same day, Walker assigned the Note and security instrument to Defendant, who is the current holder of the loan. *Id.* at 4; ECF 43 at 4 (The Note, security instrument, and documents that evidence, secure, or relate to the mortgage loan are collectively referred to as the "Loan Documents.") Although Defendant holds the loan, Walker performed the underwriting and continued to service the loan, including communicating with Plaintiffs regarding compliance with the Loan Documents.[1] ECF 43 at 4.

---

[1] Both parties assume that Walker is Defendant's agent and thus Walker's actions are attributable to Defendant. This Court will refer to Walker and Defendant separately throughout

The Loan Agreement contains various covenants restricting Plaintiffs' use of the

Property. At issue in this case is Section 6.02(a), which states in relevant part:

(a)  Use of Property

From and after the Effective Date, Borrower shall not, unless required by
applicable law or Governmental Authority:

(1)  change the use of any part of the Mortgaged Property,

(2)  convert any individual dwelling units or common areas to commercial use
or convert any common area or commercial use to individual dwelling
units . . . .

ECF 21-1, Ex. 1 at 34.

When Plaintiffs acquired the Property, the occupancy rates were not as high as Plaintiffs

expected. ECF 43 at 5. Shortly after the purchase, Barsala, LLC ("Barsala") approached

Plaintiffs with a proposal for renting unoccupied units through its "corporate housing/short term

rental model," and Plaintiffs decided to enter into several short-term rental leases ("STRs") with

Barsala. *Id.* According to its marketing materials, Barsala provides "fully furnished corporate

suites" catered towards "guests [who] travel on business." ECF 37-1 at 2, 4. Plaintiffs executed a

year-long lease for each unit with Barsala, who in turn rented the units to its customers on a

short-term basis. ECF 43 at 5. After Barsala's "exemplary performance," Plaintiffs decided to

enter into twenty-three STRs with Barsala as well as five STRs with Pelican Executive Suites,

LLC ("Pelican")—a company with a similar business model to Barsala. *Id.*

All of the rental units in the Property were designated as R-2 occupancy, which allows

only long-term rentals. ECF 37-16 at 2. The use of any units in the building as short-term rentals

this Opinion for clarity but nonetheless assumes that Walker was acting as Defendant's agent.
*See Jones v. Royal Administrative Servs, Inc.*, 887 F.3d 443, 448–49 (9th Cir. 2018) (defining
agency relationship).

was prohibited under the Property's R-2 occupancy classification. *Id.* In August 2017, the City of

Portland's Bureau of Development Services ("City") opened an investigation into Plaintiffs for

violating the accessory short-term rental requirements found in Title 33 of the Portland Zoning

Code. *See id.* at 1; ECF 44-9, Ex. 17 at 4. On May 11, 2018, the City issued a citation to

Plaintiffs for "Accessory Short Term Rental Violation" based on the STRs with Barsala and

Pelican and assessed a civil penalty of $1,000 for the violation. ECF 37-16 at 1. After receiving

the citation, Plaintiffs applied for a "[p]artial change of [u]se from R2 to R1" to change the

occupancy classification of eighteen units in the Property from nontransient to transient.[2] ECF

37-9; ECF 37-10 at 1. The City granted the application and issued the permit on March 6, 2019.[3]

ECF 37-10 at 1, 2; *see also* ECF 44-9, Ex. 17 at 8.

---

[2] Residential Group R-2 are occupancies "containing sleeping units or more than two dwelling units where the occupants are primarily permanent in nature, including Apartment houses; Congregate living facilities…Hotels (nontransient); Live/work units; Motels (nontransient); Vacation timeshare properties." 2019 Oregon Structural Specialty Code § 310.3. Residential Group R-1 are occupancies "containing sleeping units where the occupants are primarily transient in nature, including: Boarding houses (transient) with more than 10 occupants; Congregate living facilities (transient) with more than 10 occupants; Hotels (transient); Motels (transient)." *Id.* at § 310.2.

[3] Plaintiffs argue in their briefing, and argued at the September 12, 2022 hearing, that Defendant caused them to apply for the change of use permit from the City and then weaponized that permit against them. *See* ECF 43 at 9, 22. Defendant declared Plaintiffs in default based on alleged violations of the Loan Agreement on December 10, 2019 and, in the default letter, demanded proof that Plaintiffs had authorization from the City for the STRs with Barsala and Pelican. ECF 37-14 at 2–3. Plaintiffs argue that, after receiving this letter, they "hurried to complete a permit process" with the City reclassifying the subject units from R-2 to R-1 designation. ECF 43 at 9. The December 10, 2019 letter did request that Plaintiffs provide proof that the City authorized the STRs. ECF 37-14 at 3. However, the record evidence demonstrates that Plaintiffs were cited by the City for violating Portland's Zoning Code in May 2018— nineteen months before Defendant sent the default letter. ECF 37-16 at 1. Plaintiffs did not include a date on their partial change of use permit application, but it appears as though they applied for the permit on August 10, 2018 and the application went under review on August 15, 2018. *See* ECF 37-10 at 1 ("Set Up Date . . . 8/10/2018"; "Under Review Date . . . 8/15/2018"). Plaintiffs were issued the permit in March 2019—nine months before Defendant sent the default letter. ECF 37-10 at 1, 2 ("Issue Date 3/06/2019"; "999 Final Permit . . . Final Permit . . . 03/06/2019"); ECF 44-9, Ex. 17 at 8 ("Issued: 3/6 . . ."). While this Court must

PAGE 5 – OPINION AND ORDER

For the next two years, Plaintiffs submitted quarterly rent rolls to Walker reflecting the STRs with Barsala and Pelican. ECF 44 at ¶ 8*; see also* ECF 44-9, Ex. 17 at 9–10. Nonetheless, Defendant contends that they did not know about or approve of the STRs. ECF 38 at ¶ 10. Defendant argues that once they learned of the STRs, Defendant demanded that Plaintiffs terminate the leases. *Id.* Subsequently, Plaintiffs and Defendant exchanged correspondence for over a year regarding alleged violations of the Loan Agreement and events of default related to the STRs, requests for forbearance, and attempts at loan reinstatement.

On August 30, 2019, Walker, through its representative, Alexandre Rodrigue, sent an email to Plaintiffs indicating that Walker was aware of the STRs and that the best course of action would be to get approval for the leases from Defendant. ECF 44-7, Ex. 10 at 2. Rodrigue represented that "approval shouldn't be a big issue . . . ." *Id.* Plaintiffs, therefore, requested retroactive approval of the STRs, and on September 20, 2019 Walker recommended that Defendant approve the request "for twenty-eight commercial leases . . . with two executive travel companies." ECF 45-4, Ex. 11 at 1. On October 14 and 15, 2019 Defendant's employees discussed the request internally, with one employee stating that Defendant "would never approve

---

construe the facts in the light most favorable to Plaintiffs at this stage, pleadings and arguments of counsel are not evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court has carefully reviewed the record and has not found any documents that support Plaintiffs' version of the events. The only record evidence this Court has identified is a declaration statement from Plaintiffs that the Property had hired a contractor "who was securing the appropriate permits from the City." ECF 44 at ¶ 10. This court need not accept "'uncorroborated and self-serving' testimony" as true. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)). And this court need not draw inferences in favor of the non-moving party when those inferences conflict with overwhelming evidence favoring the moving party. *United States v. 1980 Red Ferrari*, 827 F.2d 477, 479 (9th Cir. 1987). As the only evidence to support Plaintiffs' position is an uncorroborated and self-serving declaration statement that conflicts with the overwhelming record evidence, this Court assumes that Plaintiffs were issued the change of use permit well before being declared in default by Defendant and, therefore, Defendant's conduct had no impact on Plaintiffs' permit application.

this request as it violates [Defendant's] charter . . . [and] would probably not be permitted under [Mortgage-Backed Securities] rules" because even though there were one-year leases in place, the units were leased to companies that operated them as "short term or corporate rentals." ECF 45-6, Ex. 13 at 3. The employee further stated that Defendant would need more information as to the percentage of the Property's income that is derived from the STRs and that he would confirm the issue regarding the Mortgage-Backed Securities rules, but that if Defendant decided to decline Plaintiffs' request, Plaintiffs would need to undo the leases, or the loan would remain in default until the leases expired. *Id.*

On October 28, 2019, a Walker representative, Sam Harrell, informed Defendant that they had sent Plaintiffs a "Reservation of Rights Letter." ECF 45-7, Ex. 14 at 2. On November 6, 2019, Defendant responded that they understood that Plaintiffs had "continue[d] to enter into more leases," which was "not in their best interest, as . . . approval look[ed] very unlikely." *Id.* at 1. Defendant nonetheless stated that the situation remained "very fluid." *Id.*

On December 10, 2019, Defendant sent Plaintiffs a formal notice of default. ECF 37-14. The default letter indicated that the STRs violated multiple provisions of the Loan Agreement, including, but not limited to Section 6.01(a)(1) and (2). *Id.* at 2. The letter represented that Defendant was considering retroactive approval of the STRs, but that, "at a minimum," Plaintiffs needed to terminate twenty-five of the twenty-eight STRs within the next thirty days. *Id.* at 2–3. Defendant also requested complete and accurate information, within the next thirty days, regarding the following: (1) "[a] description of [Plaintiffs'] arrangements with Barsala and Pelican"; (2) Plaintiffs' "short-term and long-term plans and strategy regarding [STRs]" at the Property; (3) "[a]n explanation of why [Plaintiff] believes its use of the [Property] remained residential in nature when approximately 45 percent of the residential units have been converted

into de facto hotel lodging"; and (4) Plaintiffs' "action plan for handling liability issues . . . and safety concerns" related to the STRs. *Id.* at 3. Defendant represented that, without complete and satisfactory answers to these questions, Defendant would not consider Plaintiffs' request to approve the STRs. *Id.* Finally, Defendant requested, within three business days, proof of adequate insurance to cover property and liability damage related to the STRs and proof that the City had authorized the STRs. *Id.* In the letter, Defendant also noted that all rights were reserved under the Loan Documents, including acceleration of all amounts payable. *Id.*

In early February, 2020, Defendant and Pete Rowan, a representative from Walker, conducted an inspection of the Property.[4] ECF 45-8, Ex. 16 at 1. At the inspection, Rowan requested that Defendant approve the STRs. *Id.* On February 21, 2020, Defendant sent Plaintiffs an acceleration notice. ECF 44-9, Ex. 17 at 1–5. In it, Defendant stated that Plaintiffs had failed to respond to virtually all of the demands contained in the December 10, 2019 default letter: Plaintiffs did not terminate any of the STRs; did not provide a description of the arrangements with Barsala and Pelican; did not provide any explanation as to why the use of the Property remained residential in nature; and did not provide a plan for handling liability issues and safety concerns related to the STRs. *Id.* at 2–3. Plaintiffs provided a copy of their insurance policy, which did not include any information regarding whether STRs were covered, and a copy of the

---

[4] There is no evidence in the record that Plaintiffs did anything between December and February to address the requests in Defendant's default letter. There is no evidence that they attempted to terminate the STRs or otherwise provide the information demanded. Plaintiffs suggest in their briefing that they did not attempt to terminate the STRs because they "took as genuine" Walker's representation in the August 30, 2019 email that approval of the STRs "shouldn't be a big issue." ECF 43 at 9. Plaintiffs also state that, during this time, they prepared for the inspection by Defendant and Walker representatives and "hurried to complete a permit process" with the City to change the occupancy classification of the subject units. *Id.* But as this Court noted above, *see supra* note 6, the overwhelming record evidence demonstrates that Plaintiffs applied for or were issued the change of use permit from the City well before Defendant declared them in default.

permit from the City, which had only changed the occupancy classification for eighteen units. *Id.* at 3. Defendant advised Plaintiffs that because the defaults had not been cured, Defendant was accelerating all amounts payable under the Loan Documents, including the following: "the entire unpaid principal balance of the Mortgage Loan; any accrued and unpaid interest, including interest accruing at the Default Rate; the Prepayment Premium (if applicable); . . . all other amounts payable under the Note, the Loan Agreement, and any other Loan Document" and "attorneys' fees incurred to date and that will be incurred in the future in this matter." *Id.* at 5. Defendant also noted that all rights were reserved under the Loan Documents. *Id.*

After the acceleration notice, Plaintiffs and Defendant continued to correspond regarding the alleged defaults and the resulting acceleration of the debt. On April 9, 2020, Walker representative, Rowan, stated that the late fees would be waived on the Property while Plaintiffs worked through the default issues related to the STRs. ECF 44-10, Ex. 18 at 1. However, in follow-up internal Walker correspondence, another Walker employee stated that late fees should not be waived for loans that had been accelerated, and Defendant would want to be the one to decide whether to waive fees and default interest after the loan was reinstated. ECF 45-12, Ex. 29 at 1. Rowan responded in relevant part, "Okay and that makes total sense in hindsight . . . and I should have known. Hope I didn't 'step in it' . . . ." *Id.*

On April 15, 2020, Plaintiffs submitted a request for loan forbearance related to the Covid-19 pandemic. ECF 45-13, Ex. 30 at 2. On May 11, 2020, Plaintiffs again requested forbearance on their full monthly loan payments. ECF 44-11, Ex. 19 at 2. They informed Defendant that Pelican "could no longer make lease payments under the leases and [had] surrendered possession of the vacant units" and that Barsala was "in default for failure to make lease payments" but had not surrendered possession of their units. *Id.* at 1. Plaintiffs further

stated that once the City lifted its anti-eviction policy, they would "immediately notice a default under the leases and pursue recovering possession" of the Barsala units. *Id.* at 1–2. Defendant informed Plaintiffs that loan forbearance could not be extended until the defaults had been cured. ECF 45-13, Ex. 30 at 1. On May 28, 2020, Defendant sent Plaintiffs a draft forbearance agreement and asked Plaintiffs for comments. ECF 44-12, Ex. 20 at 1. The draft agreement noted that Plaintiffs' obligation to pay the full accelerated amounts due and owing under the Loan Documents had not been waived. *Id.* at 2.

During this time, Plaintiffs continued to make the monthly payments on the loan. ECF 44 at ¶ 16; *see also* ECF 44-13, Ex. 21 at 1. These payments were held in suspense until reinstatement of the loan. ECF 44-13, Ex. 21 at 1; ECF 44-10, Ex. 18 at 1; ECF 44-14, Ex. 24 at 2. During the summer of 2020, representatives from Walker and Defendant discussed the draft forbearance agreement that would provide Plaintiffs with loan forbearance once the STRs expired at the end of October. ECF 45-14, Ex. 31 at 1; *see also* ECF 45-9, Ex. 22 at 1; ECF 45-10, Ex. 23 at 1. A Walker representative expressed frustration at the "lack of response [from Plaintiffs] . . . ." ECF 45-9, Ex. 22 at 1. In November 2020, Plaintiffs stopped making monthly installment payments, assuming that they would receive loan forbearance that month. ECF 43 at 12 n. 8.

On November 2, 2020, Plaintiffs notified Defendant that all STRs had been terminated, ECF 44-16, Ex. 27 at 1, and on December 1, 2020, Plaintiffs again requested loan forbearance, ECF 44-15, Ex. 26 at 1–2. On or about December 18, 2020, Defendant sent Plaintiffs a draft Reinstatement Agreement to be entered into effective December 31, 2020. ECF 44 at ¶ 20; ECF 44-17, Ex. 28. The Reinstatement Agreement required, among other things, that Plaintiffs pay default interest, late charges, fees and expenses incurred in connection with enforcement and

acceleration of the loan, and an unpaid debt service payment, which included a late fee. ECF 44-17, Ex. 28 at 2–3. On December 28, 2020, Plaintiffs requested that Defendant waive or remove the protective advances, default interest, late charges, late fees, and prepay. ECF 44-14, Ex. 24 at 2–3. Plaintiffs asked Defendant to confirm which fees Defendant would be willing to waive if Plaintiffs re-assumed the loan. *Id.* at 3. On December 30, 2020, Defendant explained that the protective advances would be offset by the funds currently held in suspense upon loan reinstatement and that, if Plaintiffs were willing to execute the Reinstatement Agreement by the effective date, Defendant would consider a partial reduction in default interest, late charges, and late fees, but that they would not discuss fee waivers prior to reinstatement of the loan. *Id.* at 2–3. Defendant stated that the reinstatement offer would expire on the effective date, which was the following day: December 31, 2020. *Id.* at 3. Plaintiffs refused to sign the Reinstatement Agreement or pay any of the fees included in the agreement. ECF 43 at 12.

On February 17, 2021, Plaintiffs filed suit against Defendant in Multnomah County Circuit Court stating three claims for relief: (1) violations of Oregon House Bill 4204, ECF 1-2 at ¶ 32–39; (2) a declaratory judgment that Plaintiffs are not in default under the Loan Documents, *id.* at 40–45; and (3) common law fraud, *id.* at 45–48. On April 15, 2021, Defendant removed this action to federal court. ECF 1. Defendant answered and raised three counterclaims: appointment of a receiver, breach of contract, and judicial foreclosure. ECF 5 at ¶¶ 106–142.[5] Plaintiffs filed an amended complaint on June 9, 2021 which stated the same three claims for relief, ECF 21 at ¶¶ 33–49, as well as a claim for breach of the common law duty of good faith and fair dealing, *id.* at ¶¶ 50–54. Defendant answered on June 23, 2021, raising the same three counterclaims. ECF 22.

---

[5] This Court denied Defendant's Motion to Appoint a Receiver on July 7, 2021. ECF 23.

On January 5, 2022, Defendant filed the present Motion for Summary Judgment on all of

Plaintiffs' claims and on Defendant's third counterclaim for judicial foreclosure. ECF 36.

Plaintiffs responded on March 4, 2022, ECF 43, and Defendant replied on April 8, 2022, ECF

49. A hearing on Defendant's motion was held on September 12, 2022. ECF 57. At the hearing,

the parties expressed interest in mediation, and this Court was requested to withhold ruling on

Defendant's Motion for Summary Judgment while the parties attempted to resolve this case.

Since then, the parties have been engaging in mediation, *see* ECF 58–60, but were not able to

reach a resolution.

## DISCUSSION

### A. Plaintiffs' First Claim: Violation of Oregon House Bill 4204

Plaintiffs' first claim for relief is that Defendant violated multiple provisions of

Oregon House Bill 4204 ("H.B. 4204"). ECF 21 at ¶¶ 33–40. Plaintiffs claim that

Defendant violated H.B. 4204 §§ (3)(a), (d)(A), and (d)(C) by treating failure to pay as an

event of default, imposing late fees, penalties, and default interest, and conditioning loan

forbearance on the payment of those fees and related costs during the Covid-19

emergency period. *Id.*; ECF 43 at 30–32.

Defendant moves for summary judgment on Plaintiffs' first claim on the grounds

that H.B. 4204 is inapplicable to these facts because (1) Plaintiffs defaulted and failed to

cure and Defendant accelerated the Note, prior to the "emergency period" defined in H.B.

4204, and (2) Plaintiffs' defaults were not related to "any COVID-induced financial

hardship within [H.B.] 4204's ambit." ECF 36 at 7.

Statutory interpretation is a "matter of law." *Karjalainen v. Curtis Johnston &*

*Pennywise, Inc.*, 208 Or. App. 674, 680 (2006). "When interpreting a statute, [the] goal is to

discern legislative intent . . . consider[ing] the text and context, and, where it is helpful,

PAGE 12 – OPINION AND ORDER

legislative history." *Dowell v. Oregon Mut. Ins. Co.*, 268 Or. App. 672, 676 (2015), *aff'd*, 361 Or. 62 (2017) (citing *State v. Gaines,* 346 Or. 160, 171 (2009)). Courts should "start with the statutory text because it is 'the best evidence of the legislature's intent.'" *Id.* (citing *PGE v. Bureau of Labor and Indus.,* 317 Or. 606, 610 (1993)). Oregon state law governing the construction of Oregon statutes directs: "[i]n the construction of a statute . . . the office of the judge is . . . not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all." O.R.S. 174.010.

### 1.  Violation of H.B. 4204 § (3)(a)

Plaintiffs argue that Defendant violated H.B. 4204 § (3)(a) by treating their failure to pay the accelerated debt as an event of default during the emergency period. ECF 43 at 29–30. Section (3)(a) states:

> During the emergency period, a lender may not treat as a default a borrower's failure to make a periodic installment payment or to pay any other amount that is due to the lender on or in connection with an obligation that is subject to a financing agreement if at any time during the emergency period the borrower notifies the lender that the borrower will not be able to make the periodic installment payment.

H.B. 4204 § (3)(a).

Section (2)(b) defines "emergency period" as the "period that begins on March 8, 2020, and ends on September 30, 2020, except that the Governor may specify a later date by executive order . . . ." H.B. 4204 § (2)(b).[6]

---

[6] On August 31, 2020, Governor Kate Brown issued an executive order extending the emergency period in H.B. 4204 to December 31, 2020. Executive Order No. 20-37, available at https://www.oregon.gov/gov/eo/eo_20-37.pdf (last visited February 15, 2023).

Defendant declared Plaintiffs in default on December 10, 2019, ECF 37-14, and accelerated all amounts payable under the Loan Documents on February 21, 2020, ECF 37-15. Both events preceded the emergency period found in H.B. 4204. H.B. 4204 § (2)(b)(6). Moreover, Plaintiffs' defaults were not related to failure to make a periodic installment payment or to pay any other amount as contemplated by Section 3(a). Rather, the defaults were due to violations of the Loan Agreement related to Plaintiffs' *use* of the Property.

Plaintiffs point to the fact that Defendant stated in the Motion for Summary Judgment that failure to pay the accelerated balance of the Note "constitutes an additional event of default." ECF 36 at 6, 9 n. 2; ECF 43 at 29. A statement made in a pleading is argument—it is not evidence. *See Anderson*, 477 U.S. at 252, 255. Moreover, even if Defendant's statement in a pleading constituted treating Plaintiffs' failure to pay the accelerated balance as an event of default, that statement was made in January 2022—well after the H.B. 4204 emergency period ended.

Plaintiffs further argue that the "legislature certainly would not have intended for a lender to improperly treat a loan in default during the emergency period . . . without financial repercussions." ECF 43 at 29–30. Plaintiffs contend that Defendant "should not escape liability . . . just because they declared default a couple weeks before the period began on an improper basis." *Id.* at 30. Plaintiffs seem to be arguing that if the basis for a declaration of default is improper, then the default should automatically fall within the ambit of H.B. 4204. Even if this Court were to conclude that the default was improper as Plaintiffs contend, Plaintiffs fail to point to any provision of H.B. 4204 that suggests that, if a declaration of default is improper, Plaintiffs are necessarily entitled to the protections of the statute when they would not be otherwise. Accordingly, this Court finds that Defendant did not violate H.B. 4204 § (3)(a).

### 2.  Violation of H.B. 4204 § (3)(d)(A)

Plaintiffs also argue that Defendant violated H.B. 4204 § (3)(d)(A) by imposing default interest, late fees, and other costs related to Plaintiffs' failure to make monthly payments. ECF 43 at 30. Section (3)(d)(A) states:

> A lender may not, with respect to a financing agreement that is subject to paragraph (a) or (b) of this subsection:
>
> (A) Impose or collect charges, fees, penalties, attorney fees or other amounts . . . .
>
> H.B. 4204 § (3)(d)(A).

It is undisputed that Defendant imposed charges, fees, penalties, attorney's fees, and other costs during the emergency period. *See* ECF 49 at 3. However, the text of H.B. 4204 §3(d) states that this prohibition only applies to financing agreements that are "subject to" H.B. 4204 § (3)(a) or (b). Subsection (b) is unrelated to the facts of this case. But Plaintiffs argue that the Loan Agreement is a financing agreement subject to subsection (a). Subsection (a) is the subsection discussed in the previous section of this opinion—it prohibits lenders from treating failure to pay as an event of default during the emergency period. Plaintiffs argue that the "subject to" qualification means that H.B. 4204 § (3)(d)(A) applies to any financing agreement where a lender *may not treat* failure to pay as an act of default during the emergency period. ECF 43 at 30–31. Defendant disagrees and argues that the "subject to" qualification means that H.B. 4204 § (3)(d)(A) applies only to financing agreements where a lender *has treated* failure to pay as an act of default during the emergency period. ECF 49 at 3–5.

This Court agrees with Defendant's construction of the statute. This Court must endeavor to give effect to each word that the legislature included in a statute. This Court must not "omit what has been inserted." O.R.S. 174.010. Plaintiffs' construction would render the "subject to" clause superfluous, requiring this Court to omit the words the legislature inserted. It would result

in the application of H.B. 4204 § (3)(d)(A) to *all* financing agreements, without qualification, because all lenders were prohibited from treating failure to pay as an act of default with respect to all financing agreements during the emergency period. Accordingly, this Court finds that the H.B. 4204 § (3)(d)(A) only applies to financing agreements where the lender *has treated* a borrower's failure to pay as an event of default during the emergency period. Therefore, H.B. 4204 § (3)(d)(A) does not apply to the Loan Agreement in this case because, as discussed in the previous section, Defendant did not treat failure to pay as an act of default during the emergency period. Plaintiffs defaulted well before the emergency period began, and their defaults were unrelated to failure to pay. Accordingly, this Court finds that Defendant did not violate H.B. 4204 § (3)(d)(A).

### 3. Violation of H.B. 4204 § (3)(d)(C)

Plaintiffs also argue that Defendant violated HB. 4204 § (3)(d)(C) by conditioning loan forbearance on the payment of late fees and other related costs. ECF 43 at 32.

Section (3)(d) states:

A lender may not, with respect to a financing agreement that is subject to paragraph (a) or (b) of this subsection:

(C) Treat in any manner the borrower's failure during the emergency period to make a periodic installment payment or pay another amount due on or in connection with the obligation as an ineligibility for a foreclosure avoidance measure.

H.B. 4303 § (3)(d)(C).

As discussed above, H.B. 4204 § (3)(d) applies only to agreements where a lender *has treated* failure to pay as an act of default during the emergency period. Thus, H.B. 4204 § (3)(d) does not apply to the Loan Agreement in this case. Even if it did apply, any agreement between the parties in this case is not a foreclosure avoidance measure, which Oregon law defines as "an agreement between a beneficiary and a grantor that . . . modif[ies] an obligation that is secured

by a residential trust deed." O.R.S. 86.707(2). A residential trust deed is a "trust deed on property upon which are situated four or fewer residential units." O.R.S. 86.705(6). The Property has far more than four residential units—thus, any agreement between these parties cannot secured by a residential trust deed and does not constitute a foreclosure avoidance measure. Therefore, this Court finds that Defendant did not violate H.B. 4204 § (3)(d)(C). Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiffs' first claim under H.B. 4204.

**B.  Plaintiffs' Second Claim: Declaratory Judgment**

Plaintiffs' second claim for relief is for a declaratory judgment stating they are not in default under the Loan Documents. ECF 21 at ¶¶ 41–45. They ask this Court to find that the Loan Documents did not prohibit the STRs and, even if they did, Plaintiffs are no longer in default because (1) they cured by terminating the STRS; (2) they relied on Defendant's representations as to the status of the loan; and (3) Defendant's acceptance of loan payments after declaration of default and acceleration of the Note acted as a waiver of default. *Id.* at ¶ 44.

Defendant moves for summary judgment on Plaintiffs' second claim on the grounds that Plaintiffs breached Sections 6.02(a)(1) and (a)(2) of the Loan Agreement as a matter of law. ECF 36 at 9–13. Sections 6.02(a)(1) and (a)(2) prohibit Plaintiffs from "chang[ing] the use of all or any part of the Mortgaged Property" and "convert[ing] any individual dwelling units or common areas to commercial use," respectively, unless "required by applicable law or Governmental Authority." ECF 21-1 at 34. Defendant contends that these provisions are not "mere technical defaults bereft of importance" because Defendant is required to conform to their Congressionally-mandated charter which requires Defendant to confine operations as far as practicable to residential mortgages. ECF 36 at 9; *see also* 12 U.S.C. § 1454.[7]

---

[7] Defendant's charter states the following: "[t]he operations of the Corporation under this section shall be confined so far as practicable to residential mortgages which are deemed by the

### 1.  Default under Section 6.02(a)(1)

Sections 6.02(a)(1) of the Loan Agreement prohibits changing the use of all or any part of the Mortgaged Property, unless required by law or Government Authority. In 2017, Plaintiffs entered into a series of STRs with Barsala and Pelican for short term corporate rentals even though the Property was zoned only for nontransient, long-term rental use. In 2018, the City issued a citation to Plaintiffs based on the STRs. After being cited by the City, Plaintiffs applied for and received a partial change of use permit to change the occupancy classification of eighteen units from nontransient to transient use. Defendant contends that the permit from the City "demonstrates a *de jure* as well as *de facto* change in use." ECF 36 at 3. Plaintiffs respond that the Loan Agreement does not provide a definition for "change of use" and therefore applying for and receiving a "partial change of use" permit from the City does not necessarily constitute a "change of use" within the meaning of the Loan Agreement. ECF 43 at 21. Plaintiffs further argue that there is no evidence that the units were "somehow used differently or even that the tenancies were short-term." *Id.*

The Oregon Supreme Court has set out the standards for interpreting contractual provisions: first, the court should examine "the text of the disputed provision, in the context of the document as a whole"; if the provision is ambiguous, the court should examine "extrinsic evidence of the contracting parties' intent"; if the provision remains ambiguous after the first two steps, the court should "rel[y] on appropriate maxims of construction." *Yogman v. Parrott*, 325 Or. 358, 361–364 (1997). A provision is ambiguous if it "has no definite significance or if it is capable of more than one sensible and reasonable interpretation; it is unambiguous if its meaning

---

Corporation to be of such quality, type, and class as to meet generally the purchase standards imposed by private institutional mortgage investors." 12 U.S.C. § 1454.

is so clear as to preclude doubt by a reasonable person." *Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App. 305, 317 (1985). Determining whether a provision is ambiguous is a "matter of law." *Yogman*, 325 Or. at 361 (quoting *Eagle Indus., Inc. v. Thompson*, 321 Or. 398, 405 (1995)). If a provision is ambiguous such that extrinsic evidence must be examined, "the question of meaning should be left to the jury." *May v. Chicago Ins. Co.*, 260 Or. 285, 293 (1971).

There are several ordinary definitions of the word "change," including "to make different in some particular." *Change*, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/change (last visited February 15, 2022). Plaintiffs argue that "change" has several other meanings, including "to make radically different" or "to give a different position, course, or direction to." ECF 43 at 21 (citing *Change*, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/change).

This Court must first consider the context of the Loan Agreement as a whole to determine whether the provision is ambiguous. *Yogman*, 325 Or. at 361. The word "change" is used many times throughout the Loan Agreement in different contexts. *See, e.g.*, ECF 21-1 at 15 ("change the amount of any such payments or deposits"); *id.* at 38 ("change the management of the Mortgaged Property,"); *id.* at 48 ("insurance requirements may change from time to time,"); *id.* at 56 ("changing its name, changing its jurisdiction of organization"). However, the document also uses the phrase "material change," *id.* at 25, and "material adverse change," *id.* at 42. This suggests that, where the agreement conveys making something radically different, the phrase, "material change," is used. For example, Section 4.02 prohibits borrowers from "mak[ing] or allow[ing] any *material change* to the organizational documents or organizational structure of Borrower, including *changes* relating to the Control of Borrower." *Id.* at 25 (emphasis added).

This same section also prohibits "filing any action, complaint, petition, or other claim to . . . otherwise *change* the Control of Borrower." *Id.* (emphasis added). The use of both "material change" and "change" in the same section suggests that they are distinct concepts. This Court finds that, in the context of the Loan Agreement as a whole, the term, "change," is unambiguous—its meaning is clear enough to preclude doubt by a reasonable person, and it simply means to make something different. Plaintiffs, at a minimum, made the use of the Property different when they applied for and received a "partial change of use" permit changing eighteen units from nontransient to transient use and when they started operating STRS in twenty-five units with short term, corporate rental companies.

Plaintiffs argue that even if they changed the use of the Property within the meaning of Section 6.02(a)(2)(1), the change was not a default because it was "required by applicable law or Governmental Authority." ECF 43 at 22–23. But the City did not require Plaintiffs to start operating STRs notwithstanding the fact that the Property was not zoned for this use. The City merely required Plaintiffs to comply with the law once they began their operations with Barsala and Pelican. Instead of applying for a change of use permit, Plaintiffs could have ceased the offending conduct. Moreover, to the extent that Plaintiffs argue that their change of use was not an event of default because "[Defendant] weaponized the very permitting that it insisted on," ECF 43 at 22, this Court disagrees. As explained above, *see supra* note 6, the only evidence in the record that Plaintiffs applied for the permit after Defendant declared them in default is a single declaration statement. This Court need not accept self-serving and uncorroborated testimony as true, *Villiarimo*, 281 F.3d at 1061, or draw inferences in favor of Plaintiffs when those inferences conflict with the overwhelming record evidence, *1980 Red Ferrari*, 827 F.2d at 479. Accordingly, this Court finds that Plaintiffs' change from R-2 to R-1 classification violated

the change of use prohibition found in Section 6.02(a)(2)(1) of the Loan Agreement as a matter of law.

### 2.  Waiver of the "Change of Use" Default

Plaintiffs argue that even if they breached the Loan Agreement, Defendant waived the default by continuing to accept rental payments. ECF 43 at 23–25. "[W]aiver is the voluntary relinquishment of a known right." *Alderman v. Davidson*, 326 Or. 508, 513 (1998). It involves "both knowledge and intention." *Id.* (quoting *Mitchell v. Hughes,* 80 Or. 574, 580–81 (1916)). Nonetheless, a party may waive the right to enforce a contractual provision based on that party's conduct. *See Alderman*, 326 Or. at 514. Conduct that is inconsistent with insistence on strict performance of the terms of an agreement may constitute waiver. *Id.* Moreover, in Oregon, non-waiver clauses are "ineffective" and do not prevent a party from waiving the conditions of a contract through their conduct. *Soltis v. Liles*, 275 Or. 537, 543 (1976).

Plaintiffs first entered into the STRs in the summer of 2017. ECF 43 at 5. It wasn't until two years later in August 2019 that Walker confronted Plaintiffs about the leases. ECF 43 at 23–24. During those two years, Plaintiffs submitted rent rolls to Walker every quarter that listed the STRs with Barsala and Pelican. *Id.* at 23. Plaintiffs argue that the rent rolls should have, at the very least, put Defendant on inquiry notice as to the existence of the leases. *Id.* at 23–24. Defendant contends that they did not know about the STRs and, as soon as they learned of the arrangements with Barsala and Pelican, they immediately demanded that Plaintiffs terminate the leases. ECF 49 at 11; *see also* ECF 38 at ¶ 10. Defendant argues that they declared Plaintiffs in default soon thereafter and, when Plaintiffs did not cure the default, accelerated the Note and held all payments in suspense, all of which is inconsistent with waiver. *See* ECF 37-14; ECF 44-9, Ex. 17; ECF 44-13, Ex. 21 at 1; ECF 44-10, Ex. 18 at 1; ECF 44-14, Ex. 24 at 2. This Court need not decide whether constructive knowledge is sufficient to constitute waiver because this

Court finds that there is a genuine issue of material fact as to whether Defendant had actual

knowledge of the STRs and whether Defendant waived the right to declare Plaintiffs in default

by continuing to accept payment from Plaintiffs.

### 3.  Materiality of the "Change of Use" Default

Plaintiffs also argue that even if they were in default, the default is not material because it

caused no damage to Defendant and is no longer ongoing. ECF 43 at 25. A breach of contract is

material only when it "goes to the very substance of the contract and defeats the object of the

parties entering into the contract." *Matter of Bisio's Estate*, 33 Or. App. 325, 331 (1978). The

Oregon Supreme Court has explained that termination of a contract is not warranted where a

contractual breach is not material. *See, e.g.*, *Walton v. Denhart*, 226 Or. 254, 262 (1961) ("[A]

recission is not warranted where the breach is not substantial and does not defeat the objects of

the parties."); *Krebs Hop Co. v. Livesley*, 51 Or. 527, 533 (1907) ("[T]o justify an abandonment

of a contract . . . the failure of the opposite party must be a total one.") (citation omitted).

Moreover, the Oregon Supreme Court has also counseled that determining whether a breach of

contract was material is ordinarily a question of fact that should be left to the jury. *See

Wasserburger v. Am. Sci. Chem., Inc.*, 267 Or. 77, 82 (1973). While this case does not present a

straightforward issue of contract recission, this Court finds that the law governing termination of

contracts is relevant to these facts and Defendant was only entitled to accelerate all amounts

payable under the Loan Documents for material breaches of the same.

Plaintiffs argue that the defaults were "immaterial" because they were "non-monetary,

questionable, and ultimately harmless and discontinued . . . ." ECF 43 at 25. Defendant counters

that Plaintiffs' defaults were material because under Defendant's Congressionally-mandated

charter, operations should be confined to residential mortgages as far as practicable. ECF 49 at

11; *see also* ECF 36 at 9. Defendant also argues that the Loan Agreement allows Defendant to

PAGE 22 – OPINION AND ORDER

declare events of default for any violations—not just material violations. ECF 49 at 11–12. Defendant argues this feature is necessary to "manage credit risk and address problem loans before the situation deteriorates further." *Id*. at 12. And at the September 12, 2022 hearing, Defendant further argued that Plaintiffs' relationship with Barsala and Pelican created a greater risk to them.

However, Defendant has not pointed this Court to any evidence in the record that it suffered harm as a result of Plaintiffs' change of use. In fact, Plaintiffs have argued that when they acquired the Property, the occupancy rates were lower than previously represented and they entered into the leases with Barsala and Pelican to fill vacant units. ECF 43 at 5. The record demonstrates that, prior to the STRs, the loan was suffering from poor financial performance due to stagnant income, high operating expenses, and declining rents caused by oversupply in the Portland market. ECF 45-4, Ex. 11 at 1–2. Moreover, Plaintiffs took care to mitigate risk associated with the STRs by staggering the lease expiration dates and requiring Barsala and Pelican maintain renter's insurance and pay a portion of the units' utility expenses. *Id.* Indeed, Walker recommended that Defendant approve the leases because removal of the STRs would result in significant rent reductions and a decline in the Property's overall financial performance. *Id.* at 2–3. Based on the record evidence, there is a genuine issue of material fact as to whether Plaintiffs' breach of Section 6.01(a)(1) was material, warranting acceleration of all amounts payable under the Loan Documents.

Thus, while this Court finds that Plaintiffs violated the Loan Agreement as a matter of law, there are genuine issues of material fact as to whether Defendant waived Plaintiffs' violation of the change of use provision found in Section 6.02(a)(1) and whether the violation was material. This Court is therefore precluded from granting summary judgment as to Plaintiffs'

claim for a declaratory judgment that they are not in default under the Loan Documents. Accordingly, Defendant's Motion for Summary Judgment is DENIED as to Plaintiffs' second claim for relief. This Court finds it unnecessary to determine, at this stage, whether the STRs also violated Section 6.01(a)(2) of the Loan Agreement.

## C.  Plaintiffs' Third Claim: Fraud and Misrepresentation

Plaintiffs' third claim for relief is for common law fraud. Plaintiffs allege that Defendant fraudulently represented that if Plaintiffs resolved the STRs, "[l]oan forbearance would be given, no fees would be assessed, and [l]oan reinstatement was possible," knowing these representations to be false and "with the intention that [Plaintiffs] rely on them." ECF 21 at ¶ 47. In their complaint, Plaintiffs allege "as a proximate result of [Defendant's] misrepresentations," they "have been damaged in an amount to be proven at trial, but not less than $682,416.00." Plaintiffs explain that they suffered "actual damages resulting from the imposition of late fees, despite the fact that [Plaintiffs] cured the alleged [STR] issues." ECF 21 at ¶ 49. Plaintiffs calculated this number by totaling the following: "late charges ($37,086.63), penalties in the form of 'Protective Advances,' which represented both a tax and insurance payment that Walker made in November 2020 ($185,597.79), and default interest charges [($459,830.52)] in a total approximate amount of $682,416.00 . . . ." ECF 21 at ¶ 28; *see also* ECF 17 at 2–3.

Defendant moves for summary judgment on Plaintiffs' third claim for relief on the grounds that Plaintiffs have no cognizable damages for this claim. ECF 36 at 15. Defendant argues that while Plaintiffs allege that they suffered damages in the form of late fees, Plaintiffs never actually paid any late fees. *Id.* Defendant contends that even if Plaintiffs were to prevail in this lawsuit, the best-case scenario for Plaintiffs is that they do *not* have to pay the late fees—not that Defendant would pay those fees *to* Plaintiffs. *Id.* at 15–16.

A common law fraud claim in Oregon has nine elements:

PAGE 24 – OPINION AND ORDER

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.

*Oregon Pub. Employees' Ret. Bd. ex rel. Oregon Pub. Employees' Ret. Fund v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 424 (2004) (quoting *Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or. 332, 350 (1950)). "Each of these essential elements of fraud must be proved, and the failure to prove any one or more is fatal to the cause of action." *Conzelmann*, 190 Or. at 350. The only issue raised by Defendant in their Motion for Summary Judgment is the ninth element: consequent and proximate injury.

It is undisputed that the terms of Defendant's proposed reinstatement agreement included Plaintiffs paying a number of fees. ECF 43 at 12; ECF 44-17, Ex. 28 at 2–3. However, it is also undisputed that Plaintiffs did not pay these fees. Plaintiffs themselves state: "Plaintiffs ultimately refused to sign the agreement or pay the fees." ECF 43 at 13; *see also id.* at 2; ECF 44 at ¶ 22. While courts in Oregon apply a "flexible approach" to calculating damages for fraud, *Pape v. Knoll*, 69 Or. App. 372, 385 (1984), this Court finds that Plaintiffs are not entitled to recover damages related to late fees because they cannot recover from Defendant what they never lost.

In their Response to Defendant's Motion for Summary Judgment, Plaintiffs argue that the issue is not whether Plaintiffs paid the late fees but instead whether they "suffered any damages as a result of [Defendant's] fraudulent misrepresentation." ECF 43 at 32, 33 n. 14. Plaintiffs argue that they suffered at least two forms of cognizable damages: (1) damages associated with losing a prospective purchaser of the Property, and (2) damages associated with taking rent concessions to fill the units after allowing the STRs to expire. *Id.* at 33. However, the factual

allegations underpinning these alleged damages were not pled in Plaintiffs' First Amended Complaint. *See* ECF 21.

While Plaintiffs are correct that Oregon courts apply a flexible approach to fraud remedies to compensate the plaintiff for whatever loss he has suffered, *Dizick v. Umpqua Cmty. Coll.*, 287 Or. 303, 312 (1979) (en banc), the Ninth Circuit has made clear that a court may not address allegations on a summary judgment motion that were not pled in the complaint. "Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Pickern v. Pier 1 Imps. (U.S.)*, Inc., 457 F.3d 963, 968 (9th Cir. 2006) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, (2002)). Where the complaint "does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (en banc). "Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (internal quotation marks and citation omitted); *see also Hasan v. E. Washington State Univ.*, 485 Fed. Appx. 169, 171 (9th Cir. 2012) (holding that a claim not pled in a plaintiff's complaint should be rejected at the summary judgment stage).

Plaintiffs must allege facts in their complaint underpinning each element of their fraud claim, including consequent and proximate injury. Plaintiffs did not plead any facts related to losing a prospective purchaser of the Property or taking rent reductions to fill the units vacated by Barsala and Pelican.[8] Indeed, while not briefed by the parties at summary judgment, this

---

[8] Moreover, even if this Court were to consider damages allegedly related to removing the STRs and re-renting those units, those damages would not be cognizable. This Court has already concluded that Plaintiffs were not permitted to operate the STRs because those leases

Court has carefully reviewed the record and has not found evidence that supports Plaintiffs' fraud claim. This Court concludes that Plaintiffs have failed to allege cognizable damages related to their claim for fraud. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiffs' third claim for relief.

### D.  Plaintiffs' Fourth Claim: Breach of Duty of Good Faith and Fair Dealing

Plaintiffs fourth claim for relief is for a breach of the common law duty of good faith and fair dealing. Plaintiffs allege that Defendant violated this duty by taking actions, "including but not limited to improperly declaring a default, making misrepresentations regarding the availability of forbearance and reinstatement, exercising its discretion in violation of the spirit of the [l]oan." ECF 21 at ¶ 52. As with their fraud and misrepresentation claim, Plaintiffs allege in the First Amended Complaint that they were "damaged in an amount to be proven at trial, but not less than $682,416.00." *Id.* at ¶ 53. Unlike the fraud claim, Plaintiffs do not specify that they suffered actual damages related to the late fees for this claim; they do, however specifically request attorney's fees and costs incurred related to this claim. *Id.* at ¶ 54. This Court reiterates that, to the extent that Plaintiffs are seeking to recover damages related to the payment of late fees, they are not entitled to those damages.

Defendant moves for summary judgment on Plaintiffs' fourth claim on the grounds that it is based only on extra-contractual preferences" which "are not reasonable *contractual* expectations." ECF 36 at 12. Moreover, Defendant argues that declarations of default are governed by the Loan Agreement's express provisions and the duty of good faith and fair dealing "cannot contradict" the Loan Agreement's express terms. *Id.* at 12–13. Defendant further argues

---

violated Section 6.02(a)(1) of the Loan Agreement. Plaintiffs are not entitled to recover for damages caused by relinquishing leases that they did not have a right to operate.

that there is no record evidence of bad faith on the part of the Defendant—Plaintiffs' allegations

are conclusory and contained only in the pleadings. *Id.* at 13.

"[T]here is an obligation of good faith in the performance and enforcement of every

contract." *Best v. U.S. Nat'l Bank*, 303 Or. 557, 561 (1987) (internal citations omitted). The

purpose of the duty of good faith and fair dealing is "to prohibit improper behavior in the

performance and enforcement of contracts." *Id.* at 562. "The [duty] serves to effectuate the

objectively reasonable expectations of the parties." *Klamath Off-Project Water Users, Inc. v.

Pacificorp*, 237 Or. App. 434, 445 (2020). "[T]he reasonable contractual expectations of the

parties are shown[] by the unambiguous terms of the contract." *Uptown Heights Assocs. v.

Seafirst Corp.*, 320 Or. 638, 647–48 (1995) (quotation marks and citation omitted). "[A] duty of

good faith and fair dealing . . . may be implied as to a disputed issue only if the parties have not

agreed to an express term that governs that issue." *Oregon Univ. Sys. V. Oregon Pub. Employees

Union, Local 503*, 185 Or. App. 506, 511 (2022). Thus, the implied duty "cannot contradict an

express contractual term, nor otherwise provide a remedy for an unpleasantly motivated act that

is expressly permitted by the contract." *Klamath Off-Project Water Users, Inc.*, 237 Or. App. at

445 (quoting *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000)). However, "the reasonable

expectations of the parties to a contract may include evidence from outside the terms of the

contract and generally present a question of fact." *Gregory Funding LLC v. Saksoft, Inc.*, No.

3:16-CV-00480–SI, 2016 WL 4480693, at *3 (D. Or. Aug. 24, 2016) (citing *Iron Horse Eng'g

Co., v. Nw. Rubber Extruders, Inc.*, 193 Or. App. 402, 421 (2004); *Brown v. Am. Prop. Mgmt.

Corp.*, 167 Or. App. 53, 63 (2000); *Cantua v. Creager*, 169 Or. App. 81, 97 (2000)).

Plaintiffs allege that Defendant breached the duty of good faith and fair dealing by

declaring Plaintiffs in default because the Loan Agreement "does not prohibit the Leases" and

"Plaintiffs reasonably expected that [Defendant] would not manufacture reasons for default." ECF 43 at 35. As this Court has already concluded, Section 6.01(a)(a)(1) of the Loan Agreement expressly prohibited the STRs with Barsala and Pelican; Plaintiffs violated the express terms of the agreement by entering into the STRs. However, there are genuine issues of material fact related to whether Defendant, through the actions of Defendant's agent, waived the right to declare Plaintiffs in default based on Plaintiffs' violation of those express terms.

Plaintiffs further allege that Defendant breached the duty by making "numerous misleading and/or false statements," including Defendant's representation that late fees would be waived and Defendant's "overall treatment of the [l]oan after accelerating it . . . [which] led Plaintiffs to believe that reinstatement of the [l]oan was premised only on the [STRs] terminating in October 2020."[9] ECF 43 at 42. Defendant does not explicitly contest whether it made false or misleading statements. Thus, the only question before this Court is whether Defendant violated the duty of good faith and fair dealing in making such statements.[10]

Plaintiffs have not identified any provisions of the Loan Agreement that would inform their reasonable expectations that late fees would be waived or that reinstatement of the loan

---

[9] In their good faith and fair dealing claim, Plaintiffs also argue again that Defendant demanded Plaintiffs demonstrate compliance with the City's rules concerning STRs, that Plaintiffs complied with that request, and that Defendant then relied on the permit to assert that Plaintiffs impermissibly changed the use of the Property. ECF 43 at 35. This Court reiterates that the record does not support that Plaintiffs obtained the permit after Defendant declared them in default. *See* supra note 6.

[10] This Court notes that Defendant has not conceded that it made such statements. *See* ECF 36 at 17 (quoting *In Veloz v. Foremost Ins. Co. Grand Rapids, Michigan*, 306 F. Supp. 3d 1271, 1281 (D. Or. 2018) ("As the court found in *Veloz*, 'pleadings are not evidence' and 'there is no evidence in the record of fraud, misrepresentation, or any other indicia of bad faith on the part of defendant.'")). Nonetheless, because Defendant has not expressly contested this fact, this Court will not consider whether Defendant made false or misleading statements at this stage— only whether such statements would violate the parties' reasonable contractual expectations.

would be premised solely on terminating the STRs and nothing else. In fact, Sections 2.02(c) and (d) expressly provide for late charges, default interest, and additional expenses. *See* ECF 21-1 at 11–13. Plaintiffs point to two pieces of extra-contractual evidence to demonstrate their reasonable expectations: the email from Walker stating that late fees would be waived, *see* ECF 43 at 35; ECF 44-20, Ex. 18 ("I can confirm that the late fees will be waived . . ."), and a declaration statement made by Ken Vonderach, the manager of the Property, *see* ECF 44 at ¶ 16 ("my understanding of the situation was that, despite [Defendant] accelerating the [n]ote, the [l]oan was in default and subject to being closed, leading to the reinstatement of the loan once the [STRs] were terminated.").

This Court notes that the evidence in the record suggesting bad faith on the part of Defendant is limited and a jury could find it unpersuasive. But it is not the job of this Court to weigh the strength of the evidence at this stage. That is the role of a jury. A reasonable jury could find that Defendant modified the contract by stating that late fees would be waived and, therefore, Plaintiffs had a reasonable contractual expectation that they would not have to pay the fees. *See Bennet v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 148 (2001) ("[P]arties to a contract may modify that contract by mutual assent.") (citation omitted); *see also Gordon v. Curtis Bros. A.D. Moodie House-Moving Co.*, 119 Or. 55, 62 (1926) (assent may be "either expressed or evidenced by circumstances from which such assent may be inferred."). This Court finds that there is a genuine issue of material fact as to whether Defendant modified the contract and as to Plaintiffs' subsequent reasonable contractual expectations. Accordingly, this Defendant's Motion for Summary Judgment is DENIED as to Plaintiffs' fourth claim for relief.

### E.  Defendant's Third Counterclaim: Judicial Foreclosure

Defendant also moves for summary judgment on their third counterclaim. Defendant counterclaims that they are entitled to judicial foreclosure of the Property. ECF 36 at 14.

Defendant is also seeking attorney's fees and costs incurred arising from the judicial foreclosure action. *Id.* Plaintiffs contend that Defendant has failed to provide evidence demonstrating the underlying debt and that judicial foreclosure is otherwise inappropriate because (1) Plaintiffs did not default under the Loan Agreement and, even if they did, Defendant waived the right to declare default, and (2) Defendant waived the right to accelerate the loan and seek foreclosure. ECF 43 at 26.

While this Court has found as a matter of law that Plaintiffs violated the Loan Agreement, this Court also found that genuine issues of material fact remain as to whether Defendant waived the right to accelerate the loan or whether acceleration of the debt was warranted based on the materiality of the breach. It follows that there remains a genuine issue of material fact as to whether Defendant likewise waived the right to seek judicial foreclosure. Therefore, Defendant's Motion for Summary Judgment is DENIED as to Defendant's counterclaim for judicial foreclosure.

## CONCLUSION

This Court concludes that Plaintiffs violated the express terms of Section 6.02(a)(1) of the Loan Agreement. However, genuine issues of material fact remain as to whether Defendant waived the right to declare Plaintiffs in default for Plaintiffs' violation of the change of use provision and whether Defendant, through Defendant's agent, modified the contract and subsequently violated Plaintiffs' reasonable contractual expectations. It follows that genuine issues of material fact also remain as to whether Defendant is entitled to judicial foreclosure of the Property. This Court concludes as a matter of law that Defendant did not violate H.B. 4204 and that Plaintiffs failed to allege cognizable damages related to their claim for fraud.

Accordingly, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

DATED this 17th day of March, 2023.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge